**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MONICA BROWNELL, | ) | CASE NO. 1:18CV950 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Monica Brownell ("Plaintiff" or "Brownell"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the

parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is VACATED and this matter is REMANDED for further consideration consistent

with this opinion.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I. PROCEDURAL HISTORY

In February 2015, Brownell filed an application for POD and DIB, alleging a disability

onset date of February 13, 2015 and claiming she was disabled due to rheumatoid arthritis,

collagenous colitis, and depression. (Transcript ("Tr.") at 11, 238, 269.) The applications were

denied initially and upon reconsideration, and Brownell requested a hearing before an

administrative law judge ("ALJ"). (Tr. 11, 168-171, 173-176.)

On February 1, 2017, an ALJ held a hearing, during which Brownell, represented by

counsel, and an impartial vocational expert ("VE") testified. (Tr. 26-133.) On May 2, 2017, the

ALJ issued a written decision finding Plaintiff was not disabled. (Tr. 11-25.) The ALJ's

decision became final on February 21, 2018, when the Appeals Council declined further review.

(Tr. 1-5.)

On April 25, 2018, Brownell filed her Complaint to challenge the Commissioner's final

decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 14, 15.)

Brownell asserts the following assignments of error:

> (1)    The ALJ's determination that Plaintiff did not meet Listing 5.08 was not
>        supported by substantial evidence.
>
> (2)    The ALJ's handling of treating gastroenterologist Tyler Stevens, M.D.'s
>        medical opinion did not comply with the requirements of the treating
>        physician rule.

(Doc. No. 13.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Brownell was born in October 1962 and was fifty four (54) years-old at the time of her

administrative hearing, making her a person closely approaching advanced age under social

security regulations. (Tr. 19.) *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). She has a high

school education and is able to communicate in English. (*Id.*) She has past relevant work as a

buyer, grocery manager, administrative clerk, cashier/checker, cook helper, inventory clerk, and

office manager. (*Id.*)

## B.    Relevant Medical Evidence[2]

In August 2014, Brownell presented to Judith Manzon, M.D., with complaints of joint

pain and swelling, particularly in her knees and wrists. (Tr. 692-695.) Dr. Manzon noted

Brownell had recently undergone an aspiration and injection of her right knee, and been

prescribed a course of steroids. (Tr. 693.) Examination revealed swelling and tenderness in

Brownell's bilateral knees, left elbow, and right wrist. (Tr. 694.) Dr. Manzon also noted

Brownell weighed 109 pounds[3] and had positive abdominal sounds. (*Id.*) She diagnosed

inflammatory arthritis with synovitis of the knees and left elbow, and recommended

methotrexate. (Tr. 695.)

On September 13, 2014, Brownell established care with primary care physician Perry

Schall, M.D. (Tr. 404-409.) She complained of pain and swelling in her knees, ankles and

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' Briefs. The Court feels compelled to note that
the recitation of the facts in Defendant's Brief fails to comply with this Court's
Initial Order. In relevant part, that Order (Doc. No. 5) states: "Defendant's brief
shall specifically address the legal issues and facts cited by plaintiff and shall cite, by
exact and specific transcript page number, all relevant facts in a 'Facts' section." (*Id.*)
Here, Defendant's entire discussion of the lengthy medical record in this case is one and
a half pages long, consisting of no more than four short paragraphs. (Doc. No. 14 at 2-3.)
Defendant fails to address the thorough recitation of the facts set forth in Plaintiff's
Brief on the Merits and, further, fails to "cite, by exact and specific transcript page
number, all relevant facts" in her Facts Section as required by this Court's Order.

[3] Medical records indicate Brownell is 5'7". *See, e.g.*, Tr. 408.

hands.  (Tr. 405.)  On examination, Dr. Schall noted Brownell was 5'7" and weighed 108 pounds, for a BMI of 16.91.  (Tr. 408.)  He assessed chronic inflammatory arthritis, ordered blood work and an ECG, and referred Brownell to rheumatology.  (*Id*.)

Brownell presented to Lutul Farrow, M.D., on September 23, 2014.  (Tr. 402-403.)  Dr. Farrow noted "boggy swelling as well as an effusion in her bilateral knees."  (Tr. 403.)  She aspirated Brownell's knees and administered Kenalog injections.  (*Id*.)

On October 30, 2014, Brownell returned to Dr. Schall with complaints of diarrhea for the previous three weeks.  (Tr. 400-401.)  She also reported abdominal cramping, fatigue, weakness, and weight loss.  (*Id*.)  Brownell weighed 103 pounds and was described as thin.  (Tr. 401.)  Dr. Schall diagnosed diarrhea and ordered lab work.  (*Id*.)  Several weeks later, Brownell telephoned Dr. Schall's office and reported her diarrhea was "much worse," occurring 15 to 20 times per day.  (Tr. 398.)  She indicated "she had to leave work yesterday due to soiling herself" and stated "she has no control over this now and she is at home asking for help."  (*Id*.)

On November 18, 2014, Brownell presented to the ER with complaints of severe diarrhea for the past five to six weeks.  (Tr. 372-373, 945.)  She reported weakness, fatigue, and abdominal cramping, along with significant weight loss.  (*Id*.)  On examination, Brownell weighed 45 kg (i.e., 99.2 pounds) and had a BMI of 15.  (Tr. 373, 945.)  She was described as weak, in moderate distress, and pale, with a diffusely tender abdomen.  (*Id*.)  Brownell underwent a CT of her abdomen and pelvis, which showed mild wall thickening involving the sigmoid colon which "may indicate mild degree of colitis."  (Tr. 1011.)  She was admitted for evaluation and treatment.  (Tr. 373, 945.)

The following day, Brownell was evaluated by gastroenterologist Tyler Stevens, M.D. (Tr. 379-381, 952-955.) On examination, Brownell weighed 101 pounds with a BMI of 15.36. (Tr. 955.) Dr. Stevens noted Brownell had lost 20 pounds and interpreted the CT scan as showing sigmoid colitis. (Tr. 952.) He found soft deep tenderness in her lower abdominal quadrants, left more than right. (Tr. 955.) He ordered lab work and a colonoscopy with biopsies. (Tr. 379.)

On that same date, Brownell underwent an Initial Nutrition Assessment, which found severe protein-calorie malnutrition and "unintentional weight loss related to GI dysfunction as evidenced by colitis and diarrhea." (Tr. 383.) Treatment records contain a "weight history," showing that, between January 31, 2013 and November 18, 2014, Brownell's weight fluctuated between 101 and 118 pounds.[4] (Tr. 384.) Brownell reported she had been "bedridden, rarely out of bed for a duration of 1.5 months." (*Id.*)

Brownell underwent a colonoscopy on November 20, 2014, which was unremarkable. (Tr. 387-388.) Dr. Stevens ordered colon biopsies. (Tr. 387.) On November 21, 2014, Dr. Stevens indicated a diagnosis of possible celiac disease, and ordered an EGD with a small bowel biopsy. (Tr. 390.) Brownell was released on November 22, 2014, in stable condition. (Tr. 945-946.) Her final diagnoses were weight loss, diarrhea, dehydration, anemia, rheumatoid arthritis, and anemia of chronic disease. (Tr. 946.)

On November 26, 2014, Brownell returned to Dr. Schall for follow-up after her hospitalization. (Tr. 368-370.) Dr. Schall noted the biopsies of her colon had shown

---

[4] This assessment indicates Brownell's "ideal body weight" is 63.6 kg, i.e., 140 pounds. (Tr. 384.)

collagenous colitis.  (Tr. 369.)  Brownell weighed 101 pounds and was described as thin.  (Tr. 370.)  Dr. Schall found "she has lost a significant amount of weight and muscle tone/strength; not capable of working yet."  (Tr. 369.)  He diagnosed collagenous colitis, prescribed Budesonide, and referred her to gastroenterology.  (Tr. 370.)

On January 22, 2015, Brownell presented to Dr. Stevens for follow-up regarding her colitis.  (Tr. 367.)  She reported a "dramatic improvement in diarrhea" since beginning medication, and had gained 10 pounds.  (*Id.*)  Brownell's weight was recorded as 110 lbs with a BMI of 17.22.  (*Id.*)  Dr. Stevens advised her to continue her medication for 3 months and then begin to wean herself off.  (*Id.*)  He instructed her to avoid NSAIDS and return for follow up in 3 months.  (*Id.*)

Brownell returned to Dr. Farrow on February 17, 2015 for evaluation of her bilateral knee pain and effusions.  (Tr. 365-366.)  She reported improvement after her last aspiration and injection, but indicated her knees and hands "began to flare up again" over the previous two months.  (*Id.*)  Dr. Farrow noted that xrays "reveal inflammatory degeneration of the knee, worse in the medial compartments."  (*Id.*)  She performed aspiration of the left knee and administered cortisone injections in Brownell's bilateral knees.  (*Id.*)

On March 2, 2015, Brownell presented to rheumatologist Alla Model, M.D., for evaluation.  (Tr. 1131-1134.)  She reported inflammation in her hands and knees, resulting in difficulty driving and walking up stairs.  (Tr. 1131.)  On examination, Dr. Model noted mild pain to palpation in Brownell's lumbar spine and sacroiliac joints; painful movement in her bilateral shoulders; painful movement and swelling in her bilateral wrists and knees; and normal gait, reflexes, pulses, and sensation.  (Tr. 1133-1134.)  She assessed chronic inflammatory arthritis,

ordered x-rays of Brownell's sacroiliac joints, and prescribed Humira. (Tr. 1134.) Brownell underwent the sacroiliac joint x-rays that same date, which revealed mild bilateral sacroiliac degenerative changes but no evidence of sacroiliitis. (Tr. 1144.)

On March 26, 2015, Brownell presented to rheumatology nurse practitioner Denise Smith Hauser for instruction regarding her Humira injections. (Tr. 632-635.) Brownell weighed 117 pounds. (Tr. 635.) Examination again revealed painful movement in her bilateral shoulders; painful movement and swelling in her bilateral wrists and knees; and normal gait, reflexes, pulses, and sensation. (*Id.*)

The following month, on April 14, 2015, Brownell underwent a Functional Capacity Evaluation with occupational therapist Lidiya Kanarsky, O.T.R./L. (Tr. 626-629.) Brownell reported pain in "most joints," and rated her pain a 9 on a scale of 10. (Tr. 627.) Examination revealed abnormal vibration in Brownell's right knee; numbness and tingling in her bilateral lower extremities from the knees down; and reduced muscle strength in her bilateral upper extremities (4/5), hips (3+/5), and bilateral knees and ankles (4/5). (Tr. 628.) Brownell was able to tolerate a total of 45 minutes of sitting during the evaluation, 30 minutes of which were uninterrupted. (*Id.*) She tolerated a combined total of 15 minutes of standing and walking, and was able to climb steps without difficulty. (Tr. 628-629.) Brownell was able to lift and carry 15 pounds for 30 feet with the right hand, 11 pounds for 30 feet with the left hand, and 15 pounds for 30 feet with both hands. (Tr. 629.) Ms. Kanarsky concluded as follows:

> Mrs. Brownell's performance on this Physical Capacity Evaluation has been consistent with a sedentary type job task. The client would be able to lift and/or carry maximum of 12.5# occasionally with frequent lifting and carrying of no more than 6#. It would not be recommended for this client to do any repetitive tasks, she has to alternate repetitive with non-repetitive. It would be recommended for this client to change her working position every 20-30 minutes to prevent pain associated

7

with joint stiffness.  The client may benefit from out-patient Occupational Therapy for proper body mechanics and joint protection education as well as learning some alternative modalities for pain relief.

(Tr. 629.)

Brownell returned to Dr. Schall on April 17, 2015.  (Tr. 928-931.)  Brownell reported decreased episodes of diarrhea and stated she had gained 22 pounds since her last visit.  (Tr. 928.)  Examination findings were normal.  (Tr. 930.)  Dr. Schall assessed collagenous colitis and noted Brownell was improving with medication.  (*Id.*)

On June 19, 2015, Brownell telephoned Dr. Stevens and complained of worsening diarrhea.  (Tr. 921.)  Dr. Stevens prescribed medication and advised Brownell to schedule an appointment for follow-up in the next few weeks.  (Tr. 922.)

On August 7, 2015, Brownell returned to Dr. Schall.  (Tr. 1327-1330.)  She reported recurrent diarrhea, bilateral knee pain and swelling, and anxiety.  (Tr. 1328.)  Brownell weighed 122 pounds and abdominal examination was normal.  (Tr. 1329.)  Dr. Schall assessed chronic inflammatory arthritis and collagenous colitis.  (*Id.*)  He advised her to discontinue Humira due to an allergic reaction, and referred her to rheumatology.  (*Id.*)

On November 17, 2015, Brownell returned to Dr. Farrow for evaluation of her bilateral knee pain and swelling.  (Tr. 1285-1289.)  She reported an arthritis flare up since taking a trip to Georgia in August.  (Tr. 1285.)  Examination revealed 2+ effusion in her left knee, and 1+ effusion in her right knee.  (*Id.*)  Dr. Farrow aspirated and performed injections on Brownell's bilateral knees.  (*Id.*)

Brownell next returned to Dr. Farrow over nine months later, on September 6, 2016.  (Tr. 1290-1294.)  Examination revealed bilateral knee effusion, as well as "boggy swelling consistent

with synovitis." (Tr. 1290.) Dr. Farrow again aspirated and performed injections in Brownell's knees, but noted the following concern:

> Monica G Brownell is a 53 year old female here with a diagnosis of bilateral knee synovitis of rheumatologic origin. We talked with her about things today. The cortisone and aspiration is only a temporary fix to an underlying rheumatologic problem. She really needs to get reestablished with a rheumatologist. Hopefully her primary care physician can assist us with that. She is starting to have some pain in her left elbow that we previously did surgery on[5] and we really need to get her managed from a rheumatologic standpoint to keep all of her joints in good shape.

(Tr. 1290.)

Shortly thereafter, Brownell presented to Dr. Schall with complaints of increased knee pain and swelling. (Tr. 1321-1324.) She was taking a "maintenance dose" of medication and reported her colitis was "under control." (Tr. 1321.) Brownell weighed 117 pounds and had a BMI of 18.32. (Tr. 1320.) Examination findings were normal. (Tr. 1323.) Dr. Schall assessed chronic inflammatory arthritis, effusion of both knee joints, and collagenous colitis, in remission. (Tr. 1324.) He referred Brownell to rheumatology. (*Id*.)

On September 28, 2016, Brownell established care with rheumatologist Elisabeth Ray, M.D. (Tr. 1382-1387.) She reported pain and morning stiffness in her left elbow, hands, knees, wrists, and low back. (Tr. 1383.) Brownell also complained of "intermittent flares" in her colitis, indicating she "takes Budesonide a month at a time and about 6 weeks after coming off steroids she has diarrhea again." (*Id*.) On examination, Brownell weighed 114 pounds and had a BMI of 18.11. (Tr. 1385.) Dr. Ray noted Brownell's left elbow was warm and swollen with a

---

[5] The record reflects Brownell underwent left elbow surgery in June 2012, after experiencing recurrent synovitis and effusion and undergoing multiple aspirations. (Tr. 1295-1296.)

mild contracture; her left wrist was "slightly fuller" than the right; her fingers were "boggy but nontender;" good hip range of motion; and no effusion or tenderness in her knees and ankles. (*Id.*) Dr. Ray assessed inflammatory arthritis, colitis, and psoriasis; ordered x-rays of Brownell's hands, feet, and sacroiliac joints; and advised her to "re-establish" with Dr. Stevens. (Tr. 1386.)

Brownell underwent the x-rays that same date. Imaging of her hands showed "degenerative disease of bilateral first carpometacarpal joint with subchondral sclerosis, joint space narrowing, and osteophyte formation." (Tr. 1368.) The x-rays of her sacroiliac joints showed "mild degenerative disease of bilateral sacroiliac joints." (Tr. 1364.)

On November 22, 2016, Brownell returned to Dr. Stevens with complaints of severe diarrhea. (Tr. 1334-1336.) She reported having 20 diarrhea episodes per day, and losing five pounds. (Tr. 1334.) Examination revealed Brownell weighed 112 pounds with a BMI of 17.54 on that date. (Tr. 1333, 1335.) Dr. Stevens noted Brownell appeared thin, but physical examination findings were otherwise normal. (Tr. 1335.) He ordered a colonoscopy, which Brownell underwent on November 29, 2016. (Tr. 1335, 1362-1363.) Brownell's colonoscopy again revealed collagenous colitis. (Tr. 1360.)

On December 2, 2016, Dr. Stevens completed a Crohn's & Colitis Residual Functional Capacity Questionnaire. (Tr. 1313-1315.) Dr. Stevens indicated he had seen Brownell on three occasions since January 2015. (Tr. 1313.) He offered a diagnosis of collagenous colitis, identified her symptoms as chronic diarrhea, and described her prognosis as good. (*Id.*) Dr. Stevens stated Brownell experienced "periodic (approximately every 3 months) exacerbations of diarrhea requiring treatment," and noted medication resulted in improvement. (*Id.*) He concluded Brownell's experience of symptoms was severe enough to often interfere with her

attention and concentration. (Tr. 1314.) Dr. Stevens further opined she would need to take unscheduled restroom breaks on an "unpredictable" number of occasions per day, each of which would last 20 to 45 minutes. (Tr. 1315.) In addition, he found Brownell's impairments were likely to produce good days and bad days, and that she was likely to be absent from work about once per month as a result of her impairments or treatment. (*Id*.) Lastly, Dr. Stevens concluded Brownell was not a malingerer and that her impairments lasted or could be expected to last at least 12 months. (Tr. 1313.)

On December 6, 2016, Brownell presented to the ER with complaints of chronic diarrhea (20 episodes per day), nausea, weakness, dizziness, muscle cramping, and palpitations. (Tr. 1302.) ER treatment notes also indicate Dr. Schall had advised her to proceed to the ER after blood work showed low potassium and magnesium levels. (Tr. 1302, 1304.) Brownell was given oral replacements of both potassium and magnesium, and discharged home in stable condition. (Tr. 1304.)

On December 8, 2016, Brownell returned to Dr. Farrow, who described her as "very thin." (Tr. 1339.) Examination revealed "large effusions along with boggy synovitis of both knees." (*Id*.) Dr. Farrow aspirated and injected Brownell's knees, but again stated that Brownell needed to consistently follow up with rheumatology. (*Id*.)

Brownell returned to Dr. Ray on December 21, 2016. (Tr. 1375-1380.) Brownell reported a "major colitis flare" and was tearful during examination. (Tr. 1376.) She complained of diarrhea, abdominal pain, joint pain and swelling, morning stiffness, muscle weakness, back pain, rashes, headaches, dizziness, and numbness/tingling. (*Id*.) Brownell weighed 112 pounds and had a BMI of 17.54. (Tr. 1377.) She was described as "very thin." (*Id.*) Examination

11

revealed audible bowel sounds, normal strength, a warm and swollen elbow, painful right wrist, "boggy" fingers, good hip range of motion, and no effusion or tenderness in Brownell's knees or ankles. (Tr. 1377-1378.) Dr. Ray prescribed Infliximab, administered cortisone injections, and advised Brownell to continue taking Budesonide as prescribed by Dr. Stevens. (Tr. 1379.)

## C.    State Agency Reports

On May 5, 2015, state agency physician Michael Lehv, M.D., reviewed Brownell's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 144-146.) Dr. Lehv concluded Brownell could lift and carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk for about 4 hours in an 8 hour workday, and sit for about 6 hours in an 8 hour workday. (*Id*.) He further found Brownell could frequently engage in pushing and pulling of her bilateral upper and lower extremities; and occasionally stoop, kneel, crouch, crawl, climb ramps/stairs, and climb ladders, ropes, and scaffolds. (*Id*.) Dr. Lehv opined Brownell was limited to frequent reaching in all directions bilaterally, and frequent handling and fingering bilaterally. (*Id*.) Lastly, he concluded Brownell should avoid all exposure to heights, hazards, and commercial driving. (*Id.*)

On September 30, 2015, state agency physician Esberdado Villaneuva, M.D., reviewed Brownell's medical records and completed a Physical RFC Assessment. (Tr. 161-163.) He reached the same conclusions as Dr. Lehv.[6] (*Id.*)

---

[6] The Court also notes that, on May 27, 2015, Brownell underwent a consultative psychological examination with Amber Hill, Ph.D. (Tr. 908-916.) As Brownell does not challenge the ALJ's evaluation of her mental impairments, the Court will not discuss this examination in detail. In sum, Dr. Hill assessed adjustment disorder with depressed mood, and panic disorder. (Tr. 913.) She concluded Brownell appeared able to understand, remember, and carry out instructions; maintain attention and concentration and perform simple and multi-step tasks; respond appropriately to supervisors and co-

**D.     Hearing Testimony[7]**

During the February 1, 2017 hearing, Brownell testified to the following:

- She lives in a house with her husband. (Tr. 37.) She graduated from high school. (Tr. 38-39.) She has previous work experience as a receptionist/marketing assistant, grocery manager, office manager, and purchaser. (Tr. 42-54.) She stopped working on February 13, 2015. (Tr. 41.)

- She suffers from rheumatoid arthritis, osteoarthritis, and collagenous colitis. (Tr. 55, 60.) She also experiences crying spells, anxiety attacks, and depression. (Tr. 74-79.) She is unable to work for the following reasons: "I have good days and I have bad days, mostly bad days. I'm in constant pain with my arthritis. I have chronic flare-ups with my arthritis where my knees swell. My hands swell, my feet. My shoulders hurt. It's hard to hold a pen and grip it and write. It's painful to move around. My colitis is in a constant flare-up unless I'm on steroids. And even with the steroids I never know. I mean, I could get a flare-up at anytime, end up in the bathroom most of the day, most of the night. I don't think that -- I would love to go back to work but the problem is that I just am very concerned about going to a job and not being able to do what I'm supposed to be doing. That to me is very scary." (Tr. 55.)

- She experiences colitis flare-ups approximately four times per month. (Tr. 57.) Each flare-up lasts a couple days. (*Id.*) She loses weight as a result of her colitis. (Tr. 40.) She is 5'7" and usually weighs around 130 pounds, but has since fluctuated to between 112 and 118 pounds because of her condition. (Tr. 40, 85-86.) She was hospitalized for a week in November 2014 because she had a colitis flare-up that caused severe dehydration. (Tr. 58, 85.) At that time, she dropped to 83 pounds. (Tr. 58.)

- She takes steroids on an intermittent basis for her colitis. (Tr. 58-59.) When she is off the steroids, she is in the bathroom every day and has more frequent flare-ups. (*Id.*) Even when she is taking the steroids, she still has flare-ups. (*Id.*) She avoids certain foods because of her colitis, and cannot take ibuprofen or Aleve because they cause flare-ups. (Tr. 58, 60.)

---

workers within a work setting; and respond appropriately to work pressures within a work setting. (Tr. 915-916.)

[7] Because Brownell's assignments of error relate principally to her collagenous colitis, the Court's discussion of the hearing testimony will focus primarily to that condition.

13

- She stopped working after she had an accident at work due to her colitis. (Tr. 56.) She did not make it to the bathroom in time, and had to tell her manager that she soiled herself. (*Id*.) She was very embarrassed and, after talking to her doctor, decided that she should no longer work. (Tr. 41, 56.)

- She experiences constant joint pain and swelling as a result of her arthritis. (Tr. 55, 62.) Her arthritis mostly affects her knees and hands. (Tr. 62.) She takes over the counter medications, and has tried Humira, Plaquenil, and Methotrexate. (Tr. 60-61.) She cannot walk up and down stairs or bend as a result of her knee pain, and has difficulty gripping/holding things and driving due to her bilateral hand pain. (Tr. 66, 64, 82-83, 87.) She uses a cane when she has an arthritis flare up. (Tr. 89.)

- Her husband cares for their dog, helps prepare meals, and does the laundry, vacuuming, sweeping, and mopping. (Tr. 38, 64-66.) She dusts, loads the dishwasher, and does some meal preparation. (Tr. 65-66.) She sometimes goes shopping with her husband but only when she can sit in the cart. (*Id*.) She does not babysit her young grandchildren because she cannot keep up with them or lift them. (Tr. 68.) On a typical day, she reads, talks to family, makes the bed, watches television, and takes naps. (Tr. 68-69.)

- She has difficulty reaching over her head or behind her. (Tr. 82-83.) She cannot bend or climb stairs. (Tr. 83.) She needs assistance washing and brushing her hair, but is able to shower independently. (Tr. 83-84.) She can sit for 30 minutes before needing to change position. (Tr. 90.)

Based on the VE's testimony, the ALJ found Brownell had past work as a buyer (light to medium exertion, skilled, SVP 7); grocery manager (medium, skilled SVP 7); administrative clerk (light to medium exertion, skilled, SVP 4); cashier/checker (light, semi-skilled, SVP 3); cook helper (medium, unskilled, SVP 2); inventory clerk (light, skilled, SVP 5); and officer manager (sedentary, skilled, SVP 7).[8] (Tr. 19, 93-116.) The ALJ then posed the following hypothetical question:

---

[8] The VE engaged in a lengthy discussion with the ALJ and Brownell's counsel regarding the fact that several of Brownell's past jobs did not fall neatly within one DOT category and were more in the nature of "composite jobs." (Tr. 93-116.) As the VE's precise discussion and classification of these jobs is not at issue in this matter, the Court will not discuss this testimony herein.

> [I]f you can please assume an individual of the claimant's age, education and work experience. If you could also assume that this individual can lift and carry, push and pull occasionally ten pounds, frequently less than ten pounds, stand and/or walk for four hours of an eight-hour workday, sit for six hours out of an eight-hour workday, frequently push and pull . . . with the bilateral upper extremity, occasionally climb ramps, stairs, ladders, ropes, scaffolds, occasionally stoop, kneel, crouch and crawl, have frequent bilateral overhead reaching and frequent bilateral handling and fingering and never be exposed to hazards.

(Tr. 116.)

The VE testified that the hypothetical individual would not be able to perform any of Brownell's past work with the exception of her previous work as an office manager as generally performed at the sedentary level. (Tr. 117-118.) The VE further explained there were transferable skills that would allow the hypothetical individual to perform other representative jobs in the economy, such as data entry clerk (sedentary, semi-skilled, SVP 4); receptionist (sedentary, semi-skilled, SVP 4); sorter (sedentary, semi-skilled, SVP 3); manager of a distribution warehouse (sedentary, skilled, SVP 6); cashier I (sedentary, skilled, SVP 5); and customer service clerk (sedentary, skilled, SVP 6). (Tr. 120-125.)

The ALJ then asked a second hypothetical as follows:

> For my second hypothetical if I were to base the limitations and abilities off of the first hypothetical but to reduce it to this individual to perform full range of sedentary work and that this individual would have frequent pushing and pulling with bilateral upper and lower extremities. . . . Would that change any of your responses regarding past work or transferability of skills and/or also those jobs that you suggested under her transferable skills?

(Tr. 125.) The VE testified his "answers would be the same." (*Id.*) The ALJ then asked whether the individual would be able to perform any of the previously identified jobs if she would have to be absent for more than one day a month. (*Id.*) The VE testified there would be no work for such an individual. (Tr. 126.)

Brownell's counsel asked the VE to consider the ALJ's first hypothetical with the additional limitation that the individual would need to use a cane "whenever she was standing in the job." (Tr. 126.) The VE testified such a limitation would be work preclusive. (*Id.*) Brownell's counsel then asked the VE to consider the ALJ's first hypothetical with the additional limitation that the individual would be limited to "unskilled work that would be simple and repetitive work and that it would be low stress, only in a low stress environment, meaning no arbitration, negotiation, [or] confrontation." (Tr. 126-127.) The VE testified the individual would not be able to perform the previously identified jobs. (Tr. 127.)

Finally, Brownell's counsel asked the VE to explain employer tolerance for off-task behavior. (Tr. 129.) The VE testified as follows:

> A:     Based on my experience, many employers will tolerate an off-task rate of up to 10% of an eight-hour workday excluding any normal breaks which equates to about six minutes per hour. And that's normally reserved for, say, restroom breaks or getting a drink or something to that effect.

> Q:     Okay. So if a person were to need to take an extra 45 minutes break even say three times a week on a regular basis due to symptoms of their illness, would that reach the -- would that exceed the maximum allowable off task of about 10%?

> A:     In my experience, the off-task rate is reserved per hour. And I've had people say, well, what if I just took an extra break for a half hour? While there is some tolerance for off task rate, there is little to no tolerance for what would be considered an extra break, even if it's a 15-minute break, as in my opinion it creates a work environment where if one employee gets it the other ones would want it and it's just— it's not something that employers, in my opinion, tolerate.

> Q:     Okay.

> A:     So, that in and of itself would be work preclusive.

(Tr. 129.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Brownell was insured on her alleged disability onset date, February 13, 2015, and remained insured through December 31, 2020, her date last insured ("DLI.") (Tr. 11.) Therefore, in order to be entitled to POD and DIB, Brownell must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.   The claimant has not engaged in substantial gainful activity since February 13, 2015, the alleged onset date (20 CFR 404.1571 et seq.)

3.   The claimant has the following severe impairments: inflammatory arthritis and collagenous colitis (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant could lift and carry ten pounds occasionally and less than ten pounds frequently. She could stand and walk

for two hours in an eight-hour workday and sit for six hours in an eight-hour workday. She could frequently push and pull with her bilateral upper and lower extremities. She could occasionally climb ramps and stairs as well as ladders, ropes, and scaffolds. She could occasionally stoop, kneel, crouch, and crawl. She could frequently reach in all directions with her upper extremities as well as frequently handle and finger bilaterally. The claimant could never be exposed to workplace hazards.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on October ** 1962 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), and 404.1568(d)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 13, 2015, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 11-20.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### *Treating Physician Dr. Stevens*

Brownell argues the ALJ erred in failing to articulate "good reasons" for rejecting Dr. Stevens' December 2016 opinion that she would need unscheduled breaks, at unpredictable frequency, lasting to 20 to 45 minutes at a time. (Doc. Nos. 13, 15.) Specifically, Brownell maintains the ALJ "failed to conduct any real analysis of" Dr. Stevens' opinion and, instead, cited generally to the record as a whole without indicating what medical evidence was considered in according the opinion only "limited weight." (*Id.*) She argues that, in fact, treatment records and imaging support both her diagnosis of collagenous colitis, as well her

complaints of periodic flare-ups causing severe diarrhea. (*Id.*) Brownell asserts the ALJ's

failure to properly consider Dr. Stevens' opinion is not harmless in light of VE testimony that the

need for additional, unscheduled breaks was "in and of itself work preclusive." (Doc. No. 15 at

6.)

The Commissioner argues the ALJ properly evaluated Dr. Stevens' opinion and gave

"well-reasoned explanations" for according it limited weight. (Doc. No. 14 at 7-9.) She

maintains the "ALJ explained that the objective medical evidence, including diagnostic testing,

and imaging, as well as Plaintiff's subjective complaints, did not support this extent of a

limitation for work breaks." (*Id.* at 8.) The Commissioner further asserts the ALJ's finding is

supported by substantial evidence in light of "generally unremarkable" physical examination

findings and diagnostic imaging showing "mild colitis." (*Id.*)

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v.

Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[9] However,

"a finding that a treating source medical opinion . . . is inconsistent with the other substantial

evidence in the case record means only that the opinion is not entitled to 'controlling weight,'

not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir.

2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[10] Indeed, "[t]reating

---

[9] Revised versions of these regulations took effect on March 27, 2017 and apply to
disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[10] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after
March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1.

source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[11] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir.

---

[11] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As set forth above, on December 2, 2016, Dr. Stevens completed a Crohn's & Colitis Residual Functional Capacity Questionnaire regarding Brownell's physical functional limitations. (Tr. 1313-1315.) Dr. Stevens offered a diagnosis of collagenous colitis and identified Brownell's symptoms as chronic diarrhea. (*Id.*) He stated Brownell experienced "periodic (approximately every 3 months) exacerbations of diarrhea requiring treatment," and noted medication resulted in improvement. (*Id.*) Dr. Stevens opined Brownell would need to take unscheduled restroom breaks on an "unpredictable" number of occasions per day, each of which would last 20 to 45 minutes. (Tr. 1315.) Lastly, Dr. Stevens found Brownell's impairments were likely to produce good days and bad days, and that she was likely to be absent from work about once per month as a result of her impairments or treatment. (*Id.*)

> The ALJ evaluated Dr. Stevens' opinion as follows:
>
> Tyler Stevens, M.D., opined in December 2016 that the claimant would need to take unscheduled bathroom breaks unpredictably and would need to be away from the workstation for 20-45 minutes per break. He opined that the claimant would be absent from work approximately one day per month due to colitis. (10F) I afforded this opinion limited weight because objective medical evidence including diagnostic testing and imaging as well as the claimant's subjective complaints did not support a finding that the claimant's impairment and related symptoms warranted this extent of work breaks.

(Tr. 18.) The ALJ assessed the following RFC: "After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant could lift and carry ten pounds occasionally and less than ten pounds frequently. She could stand and walk for two hours in an eight-hour workday and sit for six hours in an eight-hour workday. She could frequently push and pull with her bilateral upper and lower extremities. She could occasionally climb ramps and stairs as well as ladders, ropes, and scaffolds. She could occasionally stoop, kneel, crouch, and crawl. She could

frequently reach in all directions with her upper extremities as well as frequently handle and finger bilaterally. The claimant could never be exposed to workplace hazards." (Tr. 16.)

The Court finds the ALJ failed to articulate "good reasons" for rejecting Dr. Stevens' opinion.[12] The first reason provided by the ALJ for rejecting Dr. Stevens' opinion is that "objective medical evidence including diagnostic testing and imaging" do not support a finding that Brownell's "impairment and related symptoms warranted this extent of work breaks." (Tr. 18.) The Court finds that, standing alone, this statement does not constitute a "good reason." As Brownell correctly notes, the ALJ does not identify any specific "objective medical evidence" that she believes fails to support Dr. Stevens' opinion regarding the need for unscheduled breaks. Nor does the ALJ offer any explanation (at any point in the decision) of how the objective medical evidence is inconsistent with Dr. Stevens' specific opinion that Brownell would need lengthy unscheduled breaks. This is problematic because there is medical evidence in the record that appears capable of supporting Dr. Stevens' opinion.

As discussed *supra*, treatment records reflect Brownell frequently complained of colitis flare-ups causing severe chronic diarrhea. In October 2014, Brownell reported she had been experiencing severe diarrhea for the past 3 weeks, causing her to lose 5 pounds. (Tr. 400-401.)

---

[12] The Court notes it is uncontested that Dr. Stevens constituted Brownell's "treating physician" for purposes of social security regulations at the time he authored his December 2016 opinion. The record reflects Brownell presented to Dr. Stevens on three occasions prior to his opinion (in November 2014, January 2015, and November 2016). The ALJ did not reject Dr. Stevens' opinion on the ground that he was not a "treating physician" for purposes of social security regulations. In addition, the Commissioner does not argue that Dr. Stevens failed to qualify as a "treating physician" in her Briefing before this Court. Accordingly, and in the absence of any argument to the contrary, the Court finds Dr. Stevens constituted Brownell's treating physician at the time he authored his December 2016 opinion and, therefore, the ALJ was required to articulate "good reasons" for according his opinion less than controlling weight.

Several weeks later, she reported her diarrhea was getting worse (15 to 20 episodes per day) and that she had soiled herself at work. (Tr. 398.) In November 2014, Brownell was hospitalized for four days due to severe diarrhea and weight loss. (Tr. 945-946.) Hospital records indicate she was weak and in distress, and physical examination findings included deep tenderness in her lower abdominal quadrants. (Tr. 373-374, 952.) At that time, Dr. Stevens ordered colon biopsies, which revealed collagenous colitis. (Tr. 369.) While Brownell showed improvement with medication in January 2015, treatment records indicate complaints of recurrent, severe diarrhea in June and August 2015. (Tr. 921-922, 1327-1328.) Brownell again reported colitis flare ups in September, November, and December 2016, causing diarrhea, abdominal cramping, nausea and weight loss. (Tr. 1383, 1334-1336, 1302, 1376-1377.) The ALJ does not address this evidence in the context of Dr. Stevens' opinion or otherwise explain how it is inconsistent with his opinion regarding Brownell's need for unscheduled breaks.

The Commissioner nonetheless argues that remand is not required because, reading the decision as a whole, the ALJ's discussion of the medical evidence provides support for her rejection of Dr. Stevens' opinion. The Court disagrees. While the ALJ recited some of the medical evidence regarding Brownell's colitis earlier in the decision, she failed to offer any *explanation* for her conclusion that it was inconsistent with Dr. Stevens' opinion regarding unscheduled breaks. Moreover, the Court notes the ALJ's discussion of the medical evidence is cursory, at best. The decision's entire discussion of the medical evidence regarding Brownell's colitis is little more than one short paragraph, as follows:

> With regard to the claimant's colitis, the record indicates the claimant complained of abdominal pain, nausea, vomiting, diarrhea, weight loss, and incontinence. (5F/2, 6; 9F/5; 12F/5; 15F) However, despite these complaints, examinations were generally unremarkable and showed no distension, abdominal bruit, ascites,

27

or masses. (5F/9; 1lF/6; 12F/5) There was some limited evidence of tenderness in the suprapubic area and increased bowel sounds. (5F/9) Diagnostic imaging also corroborated the examination findings by showing mild colitis with no evidence of bowel obstruction. (5F/77) Surgical pathology showed collagenous colitis. (14F/17).

* * * Regarding the claimant's colitis, evidence showed that she responded well to medications including Budesonide and Zofran. (1F/35; 15F/10).

(Tr. 17-18.)

The Court finds the ALJ's perfunctory discussion of the medical evidence regarding Brownell's colitis is insufficient to remedy her failure to properly evaluate Dr. Stevens' opinion. This is particularly so where, as here, the decision fails to acknowledge or address the medical evidence that potentially supports Dr. Stevens' opinion, including medical evidence regarding the recurrent nature of Brownell's colitis flare ups and the severity and frequency of the diarrhea she experiences as a result. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 at * 6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that point to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 at * 4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Moreover, it is well established that an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physician

were rejected." *Blackburn v. Colvin*, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013).

Simply put, this Court cannot conduct a meaningful review and conclude that good reasons have

been set forth for rejecting a treating physician's opinion where an ALJ recites some of the

pertinent evidence of record and follows that recitation with an unexplained conclusion that said

opinion is inconsistent with the medical record. *See Blackburn*, 2013 WL 3977282 at * 7;

*Cassels v. Comm'r of Soc. Sec.*, 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016) ("The ALJ,

for example, 'does not offer any explanation for his conclusion' that 'the treating physician's

opinions were inconsistent with the medical evidence,' which is enough by itself for error.")

(quoting *Blackburn*, 2013 WL 3977282 at * 7); *Sacks v. Colvin*, 2016 WL 1085381 at * 5 (S.D.

Ohio March 21, 2016) ("[A]lthough the ALJ made a general statement about inconsistencies

between Dr. Bhatia's opnions and the 'medical evidence of record,' it was just that - a general

statement devoid of any specific reference to any portion of the medical evidence. Such

conclusory statements do not provide the claimant with any ability to understand their content,

nor do they provide a reviewing court with the ability to decide if the ALJ correctly or

incorrectly assessed those claimed inconsistencies."). Accordingly, the Court finds the ALJ's

first reason for rejecting Dr. Stevens' opinion does not constitute a "good reason" for purposes of

social security regulations.

The second reason provided by the ALJ for rejecting Dr. Stevens' opinion is that

Brownell's "subjective complaints did not support a finding that [her] impairment and related

symptoms warranted this extent of work breaks." (Tr. 18.) The Court finds this statement does

not constitute a "good reason." First, the ALJ fails to identify any of Brownell's specific hearing

testimony or statements that she believes are inconsistent with Dr. Stevens' opinion, rendering it

difficult for this Court to understand or meaningfully evaluate the ALJ's reasoning. Second, the Court finds the ALJ's statement that Brownell's "subjective complaints" are inconsistent with Dr. Stevens' opinion does not appear to be supported by substantial evidence. As noted *supra*, Brownell testified at the hearing that she experiences colitis flare ups approximately four times per month, each of which last several days. (Tr. 57.) She stated that, during these flare ups, she is frequently in the bathroom (both day and night). (Tr. 55, 58-59.) Brownell acknowledged she takes steroids for her colitis which help manage her diarrhea. (Tr. 58-59.) However, she explained that she cannot continuously stay on the steroids and has to go on and off them as instructed by her doctors. (*Id.*) When she is off the steroids, Brownell testified she is "in a constant flare up." (Tr. 55.) Brownell further stated that, even when she is on steroids, she "never know[s]," and "could get a flare up at anytime, [and] end up in the bathroom most of the day, most of the night." (*Id.*)

Brownell's hearing testimony is consistent with her treatment records. As noted above, Brownell frequently complained of colitis flare-ups causing severe chronic diarrhea. In October and November 2014, she reported experiencing 15 to 20 diarrhea episodes per day and indicated she had to leave work because she soiled herself at the office. (Tr. 398, 400-401.) Brownell was subsequently hospitalized for four days due to severe diarrhea and weight loss. (Tr. 945-946.) While Brownell showed improvement with medication in January 2015, treatment records indicate complaints of recurrent, severe diarrhea in June and August 2015. (Tr. 921-922, 1327-1328.) Brownell again reported colitis flare ups in September, November, and December 2016, causing diarrhea, abdominal cramping, nausea and weight loss. (Tr. 1383, 1334-1336, 1302, 1376-1377.)

The ALJ fails to explain, at any point in the decision, how Brownell's subjective complaints are inconsistent with Dr. Stevens' opinion regarding her need for lengthy, unscheduled breaks at unpredictable intervals. Accordingly, the Court finds the ALJ's second for rejecting Dr. Stevens' opinion does not constitute a "good reason" for purposes of social security regulations.

Therefore, and for all the reasons set forth above, the Court finds the ALJ failed to articulate "good reasons" for rejecting Dr. Stevens' opinion. The Court finds a remand is necessary, thereby affording the ALJ the opportunity to properly address the specific limitations proposed by Dr. Stevens therein.[13]

### Listing 5.08

Brownell next argues remand is required because the ALJ failed to properly consider whether her collagenous colitis resulted in involuntary weight loss sufficient to meet the requirements of Listing 5.08.[14] (Doc. No. 13 at 17-19.) She maintains there is a "substantial question" as to whether she met the requirements of this Listing in light of treatment records showing her BMI was below 17.50 in September 2014, November 2014, and January 2015. (*Id.*)

The Commissioner asserts the ALJ properly evaluated whether Brownell met or equaled the listings for digestive impairments. (Doc. No. 14 at 5-7.) She argues the record evidence did

---

[13] On remand, the ALJ should also give greater consideration to Dr. Stevens' opinions that (1) Brownell's symptoms would often interfere with her attention and concentration, and (2) she would likely be absent at least once per month as a result of her impairments and treatment. (Tr. 1313-1315.)

[14] To meet Listing 5.08, a claimant must prove the following: "**5.08 Weight loss due to any digestive disorder** despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period." 20 CFR Part 404, Subpart P, Appendix 1, at 5.08.

not show Brownell experienced listing level involuntary weight loss, noting the BMI levels cited by Brownell in her Brief are all prior to her February 2015 alleged onset date. (*Id.*) The Commissioner further notes Brownell improved with medication and that her BMI levels post-dating her alleged onset date were consistently above 17.50. (*Id.*)

In the interests of judicial economy, and as this matter is being remanded for further consideration of Dr. Stevens' December 2016 opinion, the Court need not reach the issue of whether the ALJ properly evaluated Brownell's colitis under Listing 5.08. However, on remand, the ALJ should consider giving a more thorough evaluation of the medical evidence regarding Brownell's colitis and weight loss, both in the context of step three and step four.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and this matter is REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**


 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 8, 2019